THE HOME INSURANCE COMPANY, *v.*
F & F CLOTHING CO., ET AL.

[No. 279, September Term, 1967.]

*Decided July 5, 1968.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Patrick J. B. Donnelly,* with whom were *George M. Radcliffe* and *Niles, Barton, Gans & Markell,* on the brief, for appellant.

*Henry J. Frankel* for appellees.

FINAN, J., delivered the opinion of the Court.

The appellees filed suit on a contract of insurance against the appellant insurer in the Superior Court of Baltimore City. The claim arose out of a theft of the appellee's goods and merchandise from the company vehicle against which loss the appellant had issued a Truckmen's and Motor Carrier's insurance policy. The parties have stipulated that the relevant portions of this policy are as follows:

"I. Subject to the following terms and conditions this policy covers:
* * *
2. Lawful goods and merchandise the property of the Named Insured or sold by them and in due course of delivery, while loaded for shipment and in transit in or on vehicles described herein owned or operated by the Named Insured and while in his care, custody or control.
3. Description of the merchandise to be hauled: Clothing and Uniforms.
4. Radius of Operation 100 miles.
* * *
"II. This Policy insures against the liability for or

> loss or damage to property described, directly caused by:
> (h) Theft of an entire shipping package excluding all pilferage * * *;"

The appellees are manufacturers and suppliers of uniforms with their place of business located in the City of Baltimore. On March 15, 1966, the appellees prepared several policemen's uniforms for delivery the following day to their customers in the Washington, D. C. area. The locations served were Silver Spring and Rockville, Maryland, Fairfax County, Virginia and Alexandria, Virginia. The uniforms and other related items of clothing were loaded into a company station wagon which was driven by an employee, Mr. Friedlander, to his home so that he could start early the following morning for Virginia. The station wagon was parked on the public street and locked, but during the night the car was entered and the merchandise, valued at $1,943.46, was stolen.

The appellees claim that the station wagon was loaded the prior evening because traffic regulations would not permit loading before 10:00 A.M. and that such a late start would prevent the salesman from completing his trip in one day. Furthermore, Mr. Friedlander testified that it was his belief that even if he could persuade his employees to load the car early on the morning of the 16th, the union would not permit the employees to work at 5:00 or 6:00 A.M.

It is the contention of the appellant that the loss is not an insured risk within any reasonable interpretation of the policy because (1) the goods were not in transit, in that when the insured left his business in downtown Baltimore to drive to his residence with the merchandise loaded on the truck, his intent was not to begin the delivery process, but rather to be in a position to begin the delivery process at an early hour the next morning; and (2) that in view of the narrow territorial limitation of the policy (100 miles) it was not contemplated there would be any overnight stoppage, unless it was in some necessary way connected with transit and delivery, and not for the convenience of the insured, which it contends was the situation in this case.

This Court has never interpreted the "in transit" clause of a shipper's insurance policy, although the question has arisen in many other jurisdictions. In general, the outcome of each case seems to depend upon those circumstances unique to the particular factual pattern presented. For example, in *J. G. Ries & Sons, Inc., v. Automobile Ins. Co. of Hartford, Conn.*, 121 N. J. L. 493, 3 A. 2d 610 (1939), the common carrier was insured against loss by theft which included a warranty that "each of the trucks carrying Pig Tin, * * * shall be in charge of at least two men * * *." The workmen loaded a truck with pig tin at a loading dock late in the afternoon. Because it was too late to make deliveries to the customers, they took the truck to the carrier's garage for the night, where it was later stolen. The court in that case held that the term "carrying" was not limited to physical movement of the truck, but involved the element of transportation toward the ultimate destination, and that the transportation began when the truck was loaded.

In *Dealers Dairy Products Co. v. Royal Ins. Co., Ltd.*, 170 Ohio St. 336, 164 N. E. 2d 745 (1960), the Court, as in the instant case, was confronted with the question of when is a cargo "in transit." There, the truck, en route to a customer, was ordered by its home office to unload the shipment at a warehouse on the way, and return home to make an emergency shipment to another customer. During the two day interval that the original shipment was in storage an entry was made into the warehouse and part was stolen. In holding that the shipment ceased to be in transit during the period in which it was stored, the court stated:

> "The words, 'in transit' and 'transportation' * * *, comprehend the carriage of goods from one point to another and ordinarily mean the movement of the goods on a transporting conveyance from the starting point to the point of delivery, including stops along the way incidental to the carriage. *Of course, minor deviations from the customary route and temporary stops, even overnight, for the convenience of the operator of the conveyance and for other purposes connected with the carriage, will not remove the goods*

*from the transportation."* (Emphasis supplied.) 164
N. E. 2d at 747.

The majority of opinions discussing this point of law issue
forth from the lower courts of record in New York State. To-
gether they represent a complete statement of what we believe
to be the applicable law.

In *Mayflower Dairy Products, Inc., v. Fidelity-Phenix Fire
Ins. Co. of New York,* 9 N. Y. S. 2d 892 (N. Y. App. 1938)
(Per Curiam) the appellant's usual practice was to keep his
trucks loaded at all times so as to enable them to roll early in
the morning. Therefore, the empty trucks were loaded late in
the afternoon and left in the company's garage, where the theft
occurred. The court was of the opinion that transit does not
commence until the conveyance leaves the point of origin, at
least in the process of moving toward its destination:

> "In our opinion in transit cannot include a period com-
> mencing in the evening of one day when for its own
> convenience the seller in its own premises loads the
> goods on its truck, and extending then on through the
> night during which the loaded truck is stored in such
> premises on to that time in the morning of the next
> day when the truck is manned and proceeds on its way
> to the point of destination. Such a situation implies
> storage." 9 N. Y. S. 2d at 893.

See also *San-Nap-Pak Mfg. Co., Inc. v. Firemen's Ins. Co. of
Newark, N. J.,* 47 N. Y. S. 2d 542, *aff'd,* 51 N. Y. S. 2d 754
(1944), where the seller's trucks were loaded on Saturday for
delivery on Monday, and were stored in the insured's lot over
the weekend. Recovery was denied on the authority of *May-
flower.* Although, on the surface, the New York cases appear to
control the instant situation, we believe that the distinction lies
in the fact that the trucks in the New York cases had not left
the place of origin, but were, in fact, being stored there, in an-
ticipation of future deliveries. Clearly, when Friedlander drove
the car from the company location to his home, he removed
it and its cargo from any position of storage.

In *Druss Stores, Inc. v. Travelers Indemnity Company,* 23
Misc. 2d 913, 206 N. Y. S. 2d 236 (N. Y. App. 1960) (Per

Curiam), a case heavily relied on by the appellants, the plaintiff's driver picked up merchandise in Connecticut and intended to drop it at his employer's place of business in Manhattan. However, because it was late Saturday afternoon, the driver *by-passed* the destination and parked his station wagon on the street in front of his house, intending to return to the place of business on Monday. During the weekend the merchandise was stolen. The court held, in an opinion which gave no reason for its decision, that the goods ceased to be in transit when he parked the car in front of his home. However, we believe that the opinion was based on the fact that the driver could have completed the delivery on Saturday, but elected, for his own convenience, to wait until Monday. More important, however, the policy coverage was limited to property, from the time it left the factory, "continuously, in due course of transportation, * * *." The element of *continuous* transportation compels us to limit that decision to its special facts.

The most recent case to raise the "in transit" problem attempts to establish some rule of law to be applied in all of these various situations.

In *Ben Pulitzer Creations, Inc. v. The Phoenix Insurance Co.*, 263 N. Y. S. 2d 373 (1965), *aff'd*, 276 N. Y. S. 2d 1009 (1966), the plaintiff-insured, a necktie manufacturer who regularly farmed out his goods for processing by contracting, carried an insurance policy which covered the property "while in due course of transit between the premises of the Insured and the premises of his contractor * * *." The contractor headed for the insured's establishment with a load of neckties, arriving late Friday afternoon, only to find that the insured had already closed for the day. The contractor then drove home and garaged and locked the station wagon with the intent to complete his delivery on Monday. The merchandise was stolen over the weekend. Here, the court decided that the products were still in the process of moving toward the insured's place of business, even though they were stationary at the driver's home. The court, after distinguishing *Mayflower, supra, San-Nap-Pak, supra,* and *Druss Stores, supra,* stated:

> "The true test thus appears to be not whether movement was interrupted overnight, or over a week end,

but whether the goods, even though temporarily at rest, were still on their way, with any stoppage merely incidental to the main purpose of delivery. * * *.

"In the final analysis, the outcome of a case such as this should be determined not by precise semantic shadings of terms of art, but by a common-sense appraisal of the overall situation." 263 N. Y. S. 2d at 376.

A review of the above authorities persuades us that Judge Carter, in the court below, was right in holding that "the items stolen were in due course of transit, not in storage, and that there was no abandonment of the original transportation process."

*Judgment affirmed with costs.*